# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| TIFFANY WINGO as Administrator of the Estate of KEVIL WINGO, SR., KIEARA WINGO, as surviving child of KEVIL WINGO, SR., ANGEL CALLOWAY, as mother and next friend of ERIKA WINGO, surviving minor child of KEVIL WINGO, SR., and FATIMA THOMAS, as mother and next friend of KEVIL WINGO, JR., surviving minor child of KEVIL WINGO, Sr. | |
| **Plaintiffs,** | CIVIL ACTION FILE NO: |
| v. | |
| WELLSTAR HEALTH SYSTEM, Inc., ANNALEEN VISSER, R.N., YVETTE BURTON, R.N., SHANNA GRIFFITH, R.N., KELLY JONES, L.P.N., SAMANTHA GARLAND, R.N., SHANNEA HOPKINS, L.P.N., COBB COUNTY SHERIFF'S OFFICE MAJOR BRANSON HARRIS, in his individual capacity, COBB COUNTY SHERIFF'S OFFICE SERGEANT CHARLES GORDON, in his individual capacity, COBB COUNTY SHERIFF'S OFFICE DEPUTY PAUL WILKERSON, in his individual capacity. | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

## PLAINTIFFS' COMPLAINT

Plaintiffs, Tiffany Wingo as Administrator of the Estate of Kevil Wingo, Sr. Kieara Wingo, as surviving child of Kevil Wingo, Sr., Angel Calloway as mother and next friend of Erika Wingo, surviving minor child of Kevil Wingo, Sr., and Fatima Thomas, as mother and next friend of Kevil Wingo, Jr., surviving minor child of Kevil Wingo, Sr.  (hereinafter collectively referred to as "Plaintiffs") files this Complaint against Defendants Wellstar Health System, Inc., Annaleen Visser, R.N., Yvette Burton, R.N., Shanna Griffith, R.N., Kelly Jones, L.P.N., Samantha Garland, R.N., Shannea Hopkins, L.P.N., Cobb County Sheriff's Office Major Branson Harris, in his official capacity, Cobb County Sheriff's Office Sergeant Charles Gordon, in his official capacity, Cobb County Sheriff's Office Deputy Paul Wilkerson, in his official capacity, and state as follows:

## **PARTIES**

### 1.

Plaintiffs are the children of Kevil Wingo, Sr. and Administrator of his estate and all reside within the Northern District of Georgia and are subject to the jurisdiction of this Court.

### 2.

Defendant Wellstar Health System, Inc. (hereinafter referred to as "Wellstar") is a domestic non-profit corporation existing under the laws of Georgia with its principal place of business at 793 Sawyer Road, Marietta, GA 30062 and

may be served with a copy of the Summons and Complaint through its registered agent, Leo E. Reichert at 793 Sawyer Road, Marietta, GA 30062 and is subject to the jurisdiction of this court.

3.

At all times material hereto, Wellstar managed the day-to-day medical operations at the Cobb County Adult Detention Center (hereinafter referred to as "CCADC").

4.

Defendant Annaleen Visser is a registered nurse that was employed by Wellstar on September 28-29, 2019 and worked at the CCADC.  Ms. Visser resides at 816 Lazarus Drive, Woodstock, Georgia, 30188 and may be served with a copy of the Summons and Complaint at this address. This Defendant is subject to the jurisdiction and venue of this Court.

5.

On September 29, 2019, Nurse Annaleen Visser worked for Wellstar and was responsible for providing care, monitoring, and observing Kevil Wingo while he was housed in the Infirmary at the CCADC.

6.

On September 29, 2019, Nurse Annaleen Visser was acting under the color of law pursuant to Wellstar's contract with the CCADC and within the course and scope of her employment with Wellstar.

7.

Defendant Yvette Burton is a registered nurse that was employed by Wellstar on September 28-29, 2019 and worked at the CCADC.  Ms. Burton resides at 3457 Laurel Knoll Court, Powder Springs, Georgia, 30127 and may be served with a copy of the Summons and Complaint at this address. This Defendant is subject to the jurisdiction and venue of this Court.

8.

On September 28-29, 2019, Nurse Yvette Burton worked for Wellstar and was responsible for providing care, monitoring, and observing Kevil Wingo while he was housed in the Infirmary at the CCADC.

9.

On September 28-29, 2019, Nurse Yvette Burton was acting under the color of law pursuant to Wellstar's contract with the CCADC and within the course and scope of her employment with Wellstar.

10.

Defendant Shanna Griffith is a registered nurse that was employed by Wellstar Health System, Inc. on September 28-29, 2019 and worked at the CCADC.  Ms. Griffith resides at 5033 Manning Drive, Douglasville, Georgia, 30135 and may be served with a copy of the Summons and Complaint at this address. This Defendant is subject to the jurisdiction and venue of this Court.

11.

On September 28-29, 2019, Nurse Shanna Griffith worked for Wellstar and was responsible for providing care, monitoring, and observing Kevil Wingo while he was housed in the Infirmary at the CCADC.

12.

On September 28-29, 2019, Nurse Shanna Griffith was acting under the color of law pursuant to Wellstar's contract with the CCADC and within the course and scope of her employment with Wellstar.

13.

Defendant Samantha Garland is a registered nurse that was employed by Wellstar Health System, Inc. on September 28-29, 2019 and worked at the CCADC.  Ms. Garland resides at 617 Lexington Way, Woodstock, Georgia, 30189 and may be served with a copy of the Summons and Complaint at this address. This Defendant is subject to the jurisdiction and venue of this Court.

14.

On September 29, 2019, Nurse Samantha Garland worked for Wellstar and was responsible for providing care, monitoring, and observing Kevil Wingo while he was housed in the Infirmary at the CCADC.

15.

On September 29, 2019, Nurse Samantha Garland was acting under the color of law pursuant to Wellstar's contract with the CCADC and within the course and scope of her employment with Wellstar.

16.

Defendant Kelly Jones is a licensed practical nurse that was employed by Wellstar Health System, Inc. on September 28-29, 2019 and worked at the CCADC.  Ms. Jones resides at 8198 Pine Cone Court, Villa Rica, GA 30180 and may be served with a copy of the Summons and Complaint at this address. This Defendant is subject to the jurisdiction and venue of this Court.

17.

On September 28-29, 2019, Kelly Jones worked for Wellstar and was responsible for providing care, monitoring, and observing Kevil Wingo while he was housed in the Infirmary at the CCADC.

18.

On September 28-29, 2019, Kelly Jones was acting under the color of law pursuant to Wellstar's contract with the CCADC and within the course and scope of her employment with Wellstar.

19.

Defendant Shannea Hopkins is a licensed practical nurse that was employed by Wellstar Health System, Inc. on September 28-29, 2019 and worked at the CCADC.  Ms. Hopkins resides at 13 Rocky Circle, White, GA 30184 and may be served with a copy of the Summons and Complaint at this address. This Defendant is subject to the jurisdiction and venue of this Court.

20.

On September 29, 2019, Shannea Hopkins worked for Wellstar and was responsible for providing care, monitoring, and observing Kevil Wingo while he was housed in the Infirmary at the CCADC.

21.

On September 29, 2019, Shannea Hopkins was acting under the color of law pursuant to Wellstar's contract with the CCADC and within the course and scope of her employment with Wellstar.

22.

On September 29, 2019 Defendant Cobb County Sheriff's Office Major Branson Harris was employed by the Cobb County Sheriff's Office and worked at the CCADC.  Major Harris resides at 58 Liberty View Ct, Acworth, GA 30101 and may be served with a copy of the Summons and Complaint at this address. This Defendant is subject to the jurisdiction and venue of this Court.

23.

On September 29, 2019, Major Harris was acting under the color of law and within the course and scope of his employment with CCADC.

24.

On September 29, 2019, Defendant Cobb County Sheriff's Office Sergeant Charles Gordon was employed by the Cobb County Sheriff's Office and worked at the CCADC.  Sergeant Gordon resides at 5379 Telford Cir, Powder Springs, GA 30127 and may be served with a copy of the Summons and Complaint at this address. This Defendant is subject to the jurisdiction and venue of this Court.

25.

On September 29, 2019, Sergeant Charles Gordon was acting under the color of law and within the course and scope of his employment with CCADC.

26.

On September 29, 2019, Defendant Deputy Paul Wilkerson was employed by the Cobb County Sheriff's Office and worked at the CCADC.   Deputy Wilkerson resides at 1068 Merchants Drive, Apt 826, Dallas, GA 30132 and may be served with a copy of the Summons and Complaint at this address. This Defendant is subject to the jurisdiction and venue of this Court.

27.

On September 29, 2019, Deputy Paul Wilkerson was acting under the color of law and within the course and scope of his employment with CCADC.

28.

The conduct of all the Defendants was within the exercise of State authority within the meaning of 42 U.S.C. § 1983.

## JURISDICTION AND VENUE

29.

This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, as well as the Eighth and Fourteenth Amendments of the United States Constitution. Jurisdiction is founded upon 28 U.S.C. §§1331, 1343, and the aforementioned constitutional and statutory provisions.

30.

This Court has jurisdiction over Plaintiffs' state tort claims pursuant to its ancillary and pendent jurisdiction under 28 U.S.C. § 1367

31.

Venue is proper in the Northern District of Georgia, Atlanta Division pursuant to 28 U.S.C. § 1391 (b) and N.D.L.R. 3.1B(3) because the event giving rise to this claim occurred in Cobb County, Georgia , which is situated within the district and divisional boundaries of the Atlanta Division of the Northern District of Georgia.

32.

Defendants all reside within the Northern District of Georgia and are subject to the jurisdiction of this Court.

33.

The matter in controversy exceeds this court's $75,000.00 jurisdictional limit, exclusive of interest and costs.

34.

Plaintiffs timely submitted an ante-litem notice and a copy of that ante litem notice is attached as Exhibit A.

## FACTUAL BACKGROUND

35.

Attached to this Complaint as Exhibit B is the Affidavit of Claire Teske, a licensed registered nurse, setting forth the standard of care and the breach of the standard of care for treatment of patients, including detainees, under these same or similar circumstances.  Nurse Teske's Affidavit is incorporated herein by reference as if the same was set forth herein verbatim.

36.

On September 23-24, 2019, Cobb County Police Department arrested Kevil Wingo for suspected drug possession of .2 grams of cocaine on a white piece of paper found in his ashtray.

37.

On September 24, 2019, Mr. Wingo was booked as a detainee at CCADC.

38.

From September 24, 2019 through September 27, 2019, Kevil Wingo was housed in the infirmary at the CCADC for suspected opiate detox.

39.

From September 24, 2019 through September 27, 2019, Wellstar medical providers at the CCADC took and recorded Mr. Wingo's vital signs including blood pressure and pulse while he was housed in the infirmary at the CCADC.

40.

On September 28, 2019, Kevil Wingo was in Three-South of the Cobb County Adult Detention Center and began to experience abdominal pain and sweats.

41.

On September 28, 2019, Kevil Wingo was moved to Four-South of the CCADC and while he was housed in that location, he experienced abdominal pain, vomiting and sweats.

42.

Deputy Devvin Campbell, Deputy Kyle Wedekind and Deputy Sherita Hicks witnessed Mr. Wingo sweating and complaining of abdominal pain.

43.

On September 28, 2019, CCADC Deputy Matthew Howard called the Infirmary and informed the Infirmary Nurse Yvette Burton that Mr. Wingo was vomiting.

44.

On September 28, 2019, Pill Nurse Natalie Chance called Nurse Yvette Burton and informed her that Mr. Wingo was sweating, vomiting and was in pain.

45.

On September 28, 2019, Nurse Yvette Burton communicated to Deputy Howard without physically evaluating Mr. Wingo that Mr. Wingo was detoxing and to have pill nurse give him medicine.

46.

On September 28, 2019, Nurse Yvette Burton had a telephone conference with Natalie Chance and told her that Mr. Wingo was detoxing, without physically evaluating Mr. Wingo.

47.

On September 28, 2019, while housed on Four-South Mr. Wingo asked Nurse Natalie Chance and CCADC deputies to go to the infirmary.

48.

On September 28, 2019, Mr. Wingo was taken to the infirmary in a wheelchair by Deputy Quentin Appleby.  While being transported to the infirmary Mr. Wingo stated to Deputy Appleby that he was having ulcer pain, that he wasn't going to make it and that he wanted to go to the hospital.  Deputy Appleby reported this information to Nurse Yvette Burton and other Wellstar medical staff when he arrived in the Infirmary with Mr. Wingo.

49.

Mr. Wingo was taken to the infirmary in a wheelchair because he had difficulty walking at that time.

50.

Mr. Wingo arrived in the infirmary on September 28, 2019 at 11:52 p.m. and at that time, he requested to go to the hospital, but the nurses and CCADC officers would not call for an ambulance and did not take him to the hospital.

51.

When Mr. Wingo arrived in the infirmary, neither Nurse Yvette Burton, Nurse Shanna Griffith nor Kelly Jones physically examined Mr. Wingo.

52.

Neither Nurse Yvette Burton, Nurse Griffith nor Kelly Jones called a physician regarding Mr. Wingo when he arrived in the infirmary or any time throughout the evening and early morning hours of September 28-29, 2019.

53.

Nurse Yvette Burton entered a note in Mr. Wingo's medical records stating that she had spoken with a Dr. Hindi and that Dr. Hindi admitted Mr. Wingo to the infirmary.

54.

Dr. Hindi was never called or involved in Mr. Wingo's care.

55.

After Mr. Wingo arrived in the infirmary, he was put in a cell where he was not removed until after 7:30 a.m. on September 29, 2019.

56.

Mr. Wingo had difficulty walking when he was initially placed in his cell upon admission to the infirmary.

57.

In the morning hours of September 29, 2019, Mr. Wingo was removed from his cell in the infirmary to be transferred to a padded Close Observation Cell located in the infirmary extension.

58.

Throughout the evening and early morning hours of September 28-29, 2019, Mr. Wingo complained of pain and communicated his complaints of pain to the Wellstar medical staff including Nurse Yvette Burton, Nurse Kelly Jones, and Nurse Shanna Griffith.

59.

At times throughout the evening and early morning hours of September 28-29, 2019, Mr. Wingo complained to Wellstar medical staff of issues with his ulcer and abdominal pain.

60.

Throughout the evening and early morning hours of September 28-29, 2019, Mr. Wingo asked Wellstar medical staff, including Nurse Yvette Burton and Nurse Shanna Griffith to go to the hospital.

61.

Nurse Kelly Jones was aware of Mr. Wingo's requests to go to the hospital throughout the evening and early morning hours of September 28-29, 2019.

62.

Mr. Wingo was in physical distress throughout the evening and early morning hours of September 28 -29, 2019.

63.

Wellstar medical staff did not physically examine Mr. Wingo throughout the evening and early morning hours of September 28-29, 2019.

64.

After initially admitting Mr. Wingo to the infirmary on September 28, 2019, Wellstar medical staff did not check Mr. Wingo's vitals any other times throughout the evening and early morning hours of September 28-29, 2019.

65.

Nurse Shanna Griffith played cards on her computer at times during the early morning hours of September 29, 2019.

66.

At times, Nurse Shanna Griffith surfed the internet for non-medical related reasons during the early morning hours of September 29, 2019.

67.

At times, Nurse Shanna Griffith watched football on her computer at times during the early morning hours of September 29, 2019.

68.

On September 29, 2019, Nurse Shanna Griffith entered at least two notes for Mr. Wingo.

69.

At or around 3:54 a.m. on September 29, 2019, Nurse Shanna Griffith entered a note into Mr. Wingo's medical chart that included language that Mr. Wingo's original compliant was nausea and vomiting from detoxing off IV Heroin,

then changed complaint to ulcers, then Mr. Wingo stated he needed to go to hospital for penile discharge, his vitals were stable, and that he was in no acute distress.

70.

Nurse Yvette Burton and Nurse Kelly Jones observed Nurse Shanna Griffith enter the 3:54 note and approved same.

71.

Nurse Griffith did not check Mr. Wingo's vitals at or around 3:54 a.m. and did not know with medical certainty if Mr. Wingo's vitals were stable at that time.

72.

None of the Wellstar medical staff checked Mr. Wingo's vitals at or around 3:54 a.m. and could not have known if his vitals were stable at that time.

73.

Mr. Wingo did show signs of acute distress throughout early morning hours of September 29, 2019.

74.

At or around 5:40 a.m. on September 29, 2019, Nurse Griffith enters a note into Mr. Wingo's medical chart that "Pt able to eat 100% of breakfast tray.  No complaints of nausea or vomiting."

75.

Nurse Kelly Jones and Nurse Samantha Garland observed Nurse Griffith enter the 5:40 a.m. note and assisted her in entering same.

76.

Nurse Shanna Griffith did not personally observe Mr. Wingo's breakfast tray at any time during the morning hours of September 29, 2019.

77.

Nurse Kelly Jones did not personally observe Mr. Wingo's breakfast tray at any time during the morning hours of September 29, 2019.

78.

Nurse Samantha Garland did not personally observe Mr. Wingo's breakfast tray at any time during the morning hours of September 29, 2019.

79.

None of the Wellstar medical staff personally observed Mr. Wingo's breakfast tray at any time during the morning hours of September 29, 2019.

80.

On September 29, 2019, after Mr. Wingo was in the infirmary for at least seven and a half hours, Wellstar Charge Nurse Annaleen Visser had Mr. Wingo removed from the infirmary and taken to a padded Close Observation Cell.

81.

At or around 7:50 a.m. on September 29, 2019, Nurse Annaleen Visser entered a note in Mr. Wingo's medical chart that Mr. Wingo was being loud, disruptive, fighting with other inmates, pretending he can't walk and drug seeking.

82.

At the time, Nurse Visser entered the 7:50 note Mr. Wingo had already been taken to the padded Close Observation Cell.

83.

At or around 7:31 a.m. on September 29, 2019, Mr. Wingo exited the infirmary cell after the cell door was opened by Deputy Lynda Marshall and was on the ground in front of the nurses' station from 7:31 a.m. – 7:40 a.m.

84.

From 7:31 a.m. – 7:40 a.m. on September 29, 2019, Mr. Wingo was in physical distress in front of the nurses' station.

85.

From 7:28 a.m. – 7:32 a.m. Mr. Wingo appeared to faint or fall to the ground in his cell at least three times. Two of those times were when he was in the front area of the cell and the third time he was in the shower area of the cell.

86.

None of the Wellstar medical personnel including Nurse Annaleen Visser, Nurse Samantha Garland, and Nurse Shannea Hopkins assisted Mr. Wingo while he was on the floor in front of the nursing station from 7:31 a.m. – 7:40 a.m. on September 29, 2019.

87.

At or around 7:31 a.m. Deputy Lynda Marshall opened Mr. Wingo's cell and he dropped to the ground in front of the nurses' station.

88.

At or around 7:31 a.m. on September 29, 2019, Sgt Charles Gordon entered the infirmary and saw Mr. Wingo on the floor in front of the nurses' station.

89.

Mr. Wingo was in physical distress and in need of immediate medical attention when Sergeant Gordon saw Mr. Wingo on the ground in front of the infirmary cell.

90.

In September 2019, Sergeant Gordon had been with the CCAD for 20 years and had experience dealing with inmates in need of medical attention.

91.

Sergeant Gordon was the Infirmary Supervisor on September 29, 2019.

92.

Per CCADC policies and procedures, Sergeant Gordon had the authority to call an ambulance for Mr. Wingo on September 29, 2019.

93.

At or around 7:40 a.m. Sergeant Gordon escorted Mr. Wingo from in front of his cell to a chair in front of the nurses' station by grabbing Mr. Wingo by his uniform collar and placing him in a chair.

94.

Mr. Wingo attempted to rest his head on a medical gurney in front of the nurses' station, but Sergeant Gordon would not allow Mr. Wingo to place his head on the gurney and pulled him back to his chair at least twice.

95.

At or around 7:43 a.m. on September 29, 2019, CCADC Watch Commander Major Branson Harris entered the infirmary and spoke with Nurse Annaleen Visser regarding moving Mr. Wingo.

96.

At the time, Major Branson Harris entered the infirmary Mr. Wingo was in obvious physical distress and needed immediate medical attention.

97.

Major Harris had been with the CCAD for 30 years and had experience dealing with inmates in need of medical attention.

98.

Per CCADC policies and procedures, Major Harris had the authority to call an ambulance for Mr. Wingo on September 29, 2019.

99.

Nurse Visser communicated to Major Branson Harris that Mr. Wingo was acting out, detoxing and should be removed to the isolated Close Observation Cell.

100.

At or around 7:46 a.m. Major Branson Harris with the assistance of Sergeant Gordon began to walk Mr. Wingo to the padded Close Observation Cell.

101.

Mr. Wingo was unable to walk from the infirmary to the Close Observation Cell and fell to the ground on the way.

102.

Neither Major Harris nor Sergeant Gordon took Mr. Wingo back to the infirmary after he fell to the ground on his way walking to the infirmary.

103.

Major Harris and Sergeant Gordon with the assistance of Deputy Nasie Mejia placed Mr. Wingo in a wheelchair and Mr. Wingo was wheeled to the Close Observation Cell.

104.

Mr. Wingo was too weak to walk to the padded Close Observation Cell.

105.

Major Harris, Sergeant Gordon, and Deputy Nasie Mejia then placed Mr. Wingo's body in the Close Observation Cell 18, removed Mr. Wingo's clothes and Major Harris placed a suicide smock on his back.

106.

Deputy Paul Wilkerson came to Mr. Wingo's cell while Major Harris, Sergeant Gordon and Deputy Mejia placed Mr. Wingo in the padded Close observation cell.

107.

Deputy Wilkerson put two cups of water in Mr. Wingo's Close Observation cell.

108.

At or around 7:50 a.m. Major Harris, Sergeant Gordon, and Deputy Mejia left the padded Close Observation cell Mr. Wingo was in and closed the door.

109.

Mr. Wingo was in obvious physical distress when he was placed in the padded Close Observation Cell and when Major Harris, Sgt Gordon and Deputy Mejia exited the padded Close Observation Cell.

110.

Mr. Wingo had a serious medical condition when he was removed from the infirmary and taken to the padded Close Observation Cell.

111.

Mr. Wingo's serious medical condition was obvious to non-medical people and he needed immediate medical care.

112.

Neither Sergeant Gordon nor Major Harris requested that Mr. Wingo receive any medical care after they put Mr. Wingo in the Close Observation Cell.

113.

Less than 12 minutes after Major Harris, Sergeant Gordon and Deputy Mejia left the padded Close Observation Cell Mr. Wingo was placed, Mr. Wingo never moved again on his own initiative.

114.

Deputy Paul Wilkerson was responsible for monitoring the padded Close Observation Cell Mr. Wingo was placed in.

115.

CCADC written policies state that Close Observation Cells are to be monitored every 15 minutes.

116.

CCADC practice is that Close Observation Cells are monitored every 12 minutes.

117.

The proper way to monitor a Close Observation cell is to physically look into the cell and determine if the detainee and/or inmate is breathing by looking at his/her chest rise and fall.

118.

Deputy Paul Wilkerson did not look into Mr. Wingo's cell on at least two occasions when he walked by Mr. Wingo's padded Close Observation Cell and scanned Mr. Wingo's cell indicating that he had monitored Mr. Wingo's cell.

119.

At or around 8:49 a.m. Deputy Wilkerson opened Mr. Wingo's padded Close Observation and noticed that he was not moving and was unresponsive.

120.

At or around 8:52 a.m. a Code Blue was called for Mr. Wingo.

121.

CCADC staff and Wellstar medical staff were unable to obtain a pulse, blood pressure or respiration for Mr. Wingo.  Mr. Wingo's skin was cool and clammy at that time and his stomach was distended. His pupils were fixed and non-reactive.  He was unable to follow verbal commands.

## COUNT I
## VIOLATION OF SECTION 42 U.S.C. SECTION 1983
## ALL DEFENDANTS

122.

Plaintiffs re-allege and incorporate herein the allegations contained in Paragraphs 1 through 121 as if fully stated herein.

123.

This count is asserted against all defendants in their individual capacities only.

124.

The conditions in which a pre-convicted detainee is confined is subject to scrutiny under the Eighth and Fourteenth Amendments of the United States Constitution and subject to actions under Section 1983.

125.

The acts of Sheriffs, deputies, nurses, and jail staff members in a detention facility in addressing an inmates' medical care are acts under color of state law.

126.

Defendant Wellstar had a contract with CCADC to provide medical services to inmates.  Accordingly, all medical personnel acting pursuant to that contract acted under color of state law.

127.

Defendants acted under color of State law under the circumstances of this case as detailed above.

128.

Mr. Wingo suffered a serious medical condition in that his ulcer had perforated and that he needed immediate medical care or he was going to die.

129.

Mr. Wingo's need for medical treatment was or should have been obvious to all defendants, but even if it was not Mr. Wingo communicated the issue with his ulcer throughout the evening and early morning hours of September 28-29, 2019.

130.

Defendants deprived Mr. Wingo of rights and privileges afforded to him under the Eighth and Fourteenth Amendments of the United States Constitution in violation of 42 U.S.C. § 1983.

131.

Defendants, individually and collectively, had an obligation to make sure that detainees/inmates at CCADC received reasonable medical care when needed.

132.

Defendants, individually and collectively, had an obligation to ensure that the serious medical needs of detainees/inmates detained at CCADC were timely and adequately addressed.

133.

Defendants failed to attend to Mr. Wingo's serious medical condition and did not provide him medical care when he was in obvious physical distress and needed medical care.

134.

Defendants' failure to adequately attend to Mr. Wingo's serious medical condition caused his death.

135.

Defendants' failure to adequately attend to Mr. Wingo's serious medical condition was in violation of the Eighth and Fourteenth Amendments of the United States Constitution.

136.

Defendants' conduct evinced a deliberate indifference to the serious medical needs and safety of Mr. Wingo.

137.

Defendants Nurse Annaleen Visser, Nurse Yvette Burton, Nurse Kelly Jones, Nurse Shanna Griffith, Nurse Samantha Garland and Nurse Shannea Hopkins violated Mr. Wingo's constitutional right to receive medical care when he was suffering from a serious medical condition by failing to provide him medical care while he was housed in the infirmary and failing to send him to the hospital after he repeatedly requested same and displayed obvious signs of physical distress.

138.

Nurse Annaleen Visser further violated Mr. Wingo's constitutional right to receive medical care after she was told by other Wellstar medical personnel that he could not breath and was asking for help, and Nurse Visser refused to examine Mr.

Wingo or check his vitals and refused to allow anyone else to examine Mr. Wingo or check his vitals.

139.

Defendants Major Harris, Sergeant Gordon and Deputy Wilkerson violated Mr. Wingo's constitutional right to receive medical care by failing to make sure that he received medical care in the infirmary after witnessing Mr. Wingo in obvious physical distress on numerous occasions from 7:31 a.m. through 9:00 a.m.

140.

Major Harris and Sergeant Gordon had both worked at the CCADC for over 30 and 20 years respectively and had witnessed individuals in medical distress and were both trained to identify individuals in medical distress.

141.

Major Harris and Sergeant Gordon witnessed Mr. Wingo experiencing a serious medical condition and unable to walk on his own.   Major Harris and Sergeant Gordon then placed Mr. Wingo in a wheelchair and wheeled him in a padded Close Observation Cell.

142.

Major Harris, Sergeant Gordon and Deputy Paul Wilkerson saw Mr. Wingo's condition when they placed him in the padded Close Observation Cell and knew or should have known that he was experiencing a serious medical

condition and needed medical attention.   They all ignored his serious medical condition and left him to die.

### 143.

Defendants knew or should have known that their failure to provide Mr. Wingo medical care could result in him suffering permanent injury or harm.

### 144.

Defendants acts showed a deliberate indifference to Mr. Wingo's medical condition and need for medical attention in violation of Eighth and Fourteenth Amendments of the United States Constitution.

### 145.

Defendants failure to provide Mr. Wingo medical care caused his death.

**COUNT II – NEGLIGENCE**
**WELLSTAR HEALTH SYSTEM, INC., NURSE ANNALEEN VISSER, NURSE YVETTE BURTON, NURSE SHANNA GRIFFITH, NURSE SAMANTHA GARLAND, NURSE KELLY JONES, NURSE SHANNEA HOPKINS**

### 146.

Plaintiffs re-allege and incorporate herein the allegations contained in Paragraphs 1 through 145 above as if fully stated herein.

147.

Plaintiff asserts this count against Defendants Wellstar, Nurse Annaleen Visser, Nurse Yvette Burton, Nurse Shanna Griffith, Nurse Samantha Garland, Nurse Kelly Jones, and Nurse Shannea Hopkins (hereinafter collectively referred to as "Wellstar Defendants").

148.

At all material times hereto, Wellstar Defendants were charged with the duty of using due and proper care in treating, caring for, and attending to Mr. Kevil Wingo.

149.

Nurse Yvette Burton, Nurse Shanna Griffith and Nurse Kelly Jones were the nurses assigned to care for Mr. Wingo on September 28-29, 2019 from around 11:45 p.m. to 6:00 a.m.  Nurse Annaleen Visser, Nurse Samantha Garland and Nurse Shannea Hopkins were assigned to care for Mr. Wingo on September 29, 2019 from around 6:00 a.m. until he died.

150.

The standard of care for a registered nurse is the reasonable degree of care and skill which, under similar conditions and like circumstances, is ordinarily employed by the profession generally.

151.

The standard of care for registered nurses treating patients in general and in confinement includes:

a.  Assess the patient/client in a systematic, organized manner;

b.  Formulate a nursing diagnosis based on accessible, communicable, and recorded data (which is collected in a systematic and continuous manner);

c.  Plan care which includes goals and prioritized nursing approaches or measures derived from the nursing diagnoses;

d.  Implement strategies to provide for patient/client participation in health promotion, maintenance, and restoration;

e.  Initiate nursing actions to assist the patient/client to maximize his/her health capabilities;

f.  Evaluate with the patient/client the status of goal achievement as a basis for reassessment, reordering of priorities, new goal-setting and revision of the plan of nursing care;

g.  Communicate, collaborate, and function with other members of the health team to provide optimum care;

h.  Respect the dignity and rights of the patient/client regardless of socioeconomic status, personal attributes, or nature of health problems; and

i.  Provide nursing care without discrimination on the basis of diagnosis, age, sex, race, creed, or color.

152.

The standard of care for a licensed practical nurse treating patients in general and in confinement includes:

a.    Participating in patient assessment activities and the planning, implementation, and evaluation of the delivery of health care services and other specialized tasks when appropriately educated and consistent with board rules and regulations;

b.   Providing direct personal patient observation, care, and assistance in hospitals, clinics, nursing homes, or emergency treatment facilities, or other health care facilities in areas of practice including, but not limited to: coronary care, intensive care, emergency treatment, surgical care and recovery, obstetrics, pediatrics, outpatient services, dialysis, specialty labs, home health care, or other such areas of practice;

c.  Performing comfort and safety measures;

d.  Administering treatments and medications by various routes;

e.  Participating in the management and supervision of unlicensed personnel in the delivery of patient care; and

f.  Performing other specialized tasks as appropriately educated.

153.

Nurse Yvette Burton, Nurse Shanna Griffith, Nurse Annaleen Visser, and Nurse Samantha Garland had a duty to Mr. Wingo to practice nursing within the standard of care and violated the standard of care for registered nurses by failing to care for Mr. Wingo as indicated in Paragraph 151(a) – (i).

154.

Nurse Yvette Burton failed to send Mr. Wingo to the hospital for care and treatment when he initially presented to the infirmary and throughout the early morning hours of September 29, 2019 when Mr. Wingo was in obvious physical distress.

155.

Nurse Burton did not contact a physician regarding Mr. Wingo's care throughout the evening and early morning hours of September 28-29, 2019.

156.

Nurse Burton did not physically examine Mr. Wingo when she was contacted by deputies regarding his care and when he was housed in the infirmary.

157.

Nurse Shanna Griffith failed to send Mr. Wingo to the hospital for care and treatment when he initially presented to the infirmary and throughout the early

morning hours of September 29, 2019 when Mr. Wingo was in obvious physical distress.

### 158.

Nurse Griffith did not contact a physician regarding Mr. Wingo's care throughout the evening and early morning hours of September 28-29, 2019.

### 159.

Nurse Griffith did not physically examine Mr. Wingo when he was housed in the infirmary.

### 160.

Nurse Griffith did not care for Mr. Wingo and should have checked his vitals regularly and evaluated and assessed Mr. Wingo.

### 161.

Nurse Annaleen Visser did not properly care for Mr. Wingo and should have reviewed his chart when her shift began, evaluated, and examined Mr. Wingo when he was in obvious physical distress and checked his vitals when Mr. Wingo was in obvious physical distress.

### 162.

Nurse Visser failed to send Mr. Wingo to the hospital for care and treatment when she saw him in the infirmary in obvious physical distress.

163.

Nurse Visser did not contact a physician regarding Mr. Wingo's care throughout the morning of September 29, 2019.

164.

Nurse Visser did not physically examine Mr. Wingo when he was housed in the infirmary in obvious physical distress.

165.

Nurse Samantha Garland should have evaluated, examined, and cared for Mr. Wingo when she saw him in obvious physical distress.

166.

Nurse Garland failed to send Mr. Wingo to the hospital for care and treatment when was in obvious physical distress.

167.

Nurse Garland did not contact a physician regarding Mr. Wingo's care the morning of September 29, 2019.

168.

Nurse Garland did not physically examine Mr. Wingo when he was housed in the infirmary in obvious physical distress.

169.

Nurse Kelly Jones and Nurse Shannea Hopkins had a duty to Mr. Wingo to practice nursing within the standard of care and violated the standard of care for licensed practical nurses by failing to care for Mr. Wingo as indicated in Paragraph 152(a) – (f).

170.

Both Nurse Kelly Jones and Nurse Shannea Hopkins failed to care for Mr. Wingo at all when they saw that he was in physical distress and failed to check his vitals.

171.

The Wellstar nurses' failure to properly care for Mr. Kevil Wingo, Sr. caused his death on September 29, 2019.

172.

At all times pertinent hereto, Nurse Annaleen Visser, Nurse Yvette Burton, Nurse Shanna Griffith, Nurse Samantha Garland, Nurse Shannea Hopkins, and Nurse Kelly Jones were acting within the course and scope of their employment with Wellstar.

173.

Wellstar is liable for acts and omissions of the nurses stated in Paragraph 172 under the doctrine of respondeat superior, agency or apparent agency.

## COUNT III – NEGLIGENCE
## MAJOR BRANSON HARRIS, SERGEANT CHARLES GORDON AND DEPUTY PAUL WILKERSON

### 174.

Plaintiffs re-allege and incorporate herein the allegations contained in Paragraphs 1 through 173 above as if fully stated herein.

### 175.

Plaintiff asserts this count against Major Branson Harris, Sergeant Charles Gordon, and Deputy Paul Wilkerson in their individual capacities only. (hereinafter collectively referred to as "CCADC Defendants")

### 176.

Providing medical care for inmates is a ministerial duty.

### 177.

CCADC Defendants must follow the written policies and procedures of the Cobb County Sheriff's Office ("CCSO").

### 178.

Following the CCSO's policies and procedures is a ministerial duty.

### 179.

CCSO policies and procedures provide that inmates shall have adequate and proper access to emergency medical care.  Medical staff shall ensure that prompt

medical attention (response) is provided in situations deemed a medical emergency.  Policy 2-06-04.00

180.

CCSO policies and procedures provide that staff shall be observant and responsive to signs of an emergency medical situation within the facility. Policy 2-06-04.01

181.

CCSO policies and procedures provide that the delivery of emergency medical services shall be a top priority, taking precedence over routine duties and responsibilities. Policy 2-06-04.01

182.

CCSO policies and procedures provide that the following medical conditions may constitute a medical emergency.

a. Head injury or severe bleeding.

b. Severe burns.

c. Serious breathing difficulties or breathing has stopped.

d. No pulse.

e. Seizures, convulsions or severe tremors

f. Unconscious, fainting (unresponsive).

g. Chest pains

h.  Other symptoms indicating a serious medical emergency.

i.  Any life-threatening injury or illness. Policy 2-06-04.01

183.

CCSO policies and procedures provide that inmates requiring emergency treatment beyond the facility's resources and capabilities shall be transported to a designated treatment facility or the nearest emergency room.  Inmates requiring increased monitoring or close observation may be placed in Close Observation Cells. Policy 2-3-07.01

184.

CCADC Defendants failed to provide Mr. Kevil Wingo emergency medical care in violation of the aforementioned CCSO policies and procedures despite Mr. Wingo's obvious need for emergency medical care when Major Harris and Sergeant Gordon took him from the infirmary to the Close Observation Cell.  At that time, Mr. Wingo had fainted, had difficulty breathing, was unable to walk on his own, was in severe pain, losing consciousness, and was in severe obvious pain.

185.

CCSO policies and procedures provide that Medical or security personnel may request placement of an inmate into Close Observation for reasons that include but are not limited to:

a.  Inmate exhibits signs of abnormal behavior (e.g. hearing voices);

b.  Inmate is displaying marked change in behavior occurring over an extended period of time (e.g. refusal of means or shower);

c.  Inmate refused to take medication; and

d.  Inmate speaks of or acts on threats of self-harm or threatens to harm others.
    Policy 2-03-07.01

186.

Mr. Kevil Wingo did not display signs of self-harm, refusal of meals or showers or a refusal to take medication.

187.

CCSO policies and procedures provide that Inmates placed in Close Observation shall require security staff to complete one or more forms for placement in Close Observation.  Those forms include:

a.  Notice of Segregation: The watch commander shall complete this form when authorizing placement of inmates in Close Observation or for other circumstances.

b.  Request for Placement in Close Observation: Any employee may complete this form for processing when requesting placement of inmates into Close Observation for various reasons.

c.  Recommended Housing Assignment by Medical or Mental Health Staff: Any healthcare provider shall complete this form when requesting placement of inmates to be housed in Close Observation.

188.

The Request for Placement in Close Observation form includes an evaluation and assessment section that one must indicate that the inmate meets the criteria for placemen in a Close Observation Cell.

189.

The Request for Placement in Close Observation form is required to be completed to ensure that an inmate meets the requirements for placement in a Close Observation Cell and has been medically cleared for placement in same.

190.

When an inmate is placed in Close Observation an OMS facility incident report shall be generated by the staff members making the request and

a.  Shall detail the reasons for requesting placement in Close Observation;

b.  Employees immediate Supervisor shall be notified;

c.  A copy of the facility incident report shall be provided to mental health professional; and

d.  A copy of the facility incident report shall be forwarded to classification staff to affect a re-classification review.  Policy 2-03-07.01

191.

None of the CCADC Defendants completed any of the required forms and/or incident reports for Mr. Wingo to be placed in a Close Observation Cell.

192.

CCSO policies and procedures provide that the placement of inmates in a Close Observation Cell requires staff to conduct frequent and random observation/security rounds that shall not be more than 15 minutes apart. Policies 2-03-07.01; 2-03-01.00

193.

CCSO policies and procedures provide that monitoring of inmates in a Close Observation Cell shall include an unobstructed visual check to ensure the inmate's presence and physical well-being. Policy 2-03-07.01

194.

Deputy Paul Wilkerson did not properly monitor Mr. Wingo after he was placed in Close Observation Cell.

195.

Deputy Paul Wilkerson did not perform an unobstructed visual check to ensure Mr. Wingo's presence and physical well-being on at least two occasions while Mr. Wingo was housed in the Close Observation Cell.

196.

The CCADC Defendants violated one or more of the aforementioned CCSO policies and procedures.

197.

CCADC Defendants negligently performed or failed to perform their ministerial functions in failing to provide Mr. Wingo emergency medical care; in failing to call for an ambulance for Mr. Wingo when he was in physical distress in Infirmary and when they transported Mr. Wingo to padded Close Observation Cell; in failing to complete required evaluations and forms for Mr. Wingo to be placed in a Close Observation Cell; and in failing to properly monitor Mr. Wingo after he was placed in padded Close Observation Cell.

198.

Mr. Wingo's death was proximately caused by the CCADC Defendants as alleged herein.

## COUNT IV
## PUNTIVE DAMAGES AGAINST NURSE ANNALEEN VISSER

199.

Plaintiffs re-allege and incorporate herein the allegations contained in Paragraphs 1 through 198 above as if fully stated herein.

200.

This Count is asserted against Nurse Annaleen Visser only.

201.

The acts and omissions of Annaleen Visser as alleged showed intent, willful misconduct, malice, fraud, wantonness, oppression and/or that entire want of care which raised the presumption of conscious indifference to the consequences entitling Plaintiffs to an award of punitive damages in an amount sufficient to deter Nurse Annaleen Visser from the same or similar actions in the future in accordance with O.C.G.A. § 51-12-5.1.

202.

Nurse Annaleen Visser is a trained registered nurse that has worked at the CCADC for over 20 years.

203.

Nurse Annaleen Visser harbored negative feelings against Mr. Wingo based on Mr. Wingo being a black male.

204.

Nurse Annaleen Visser harbors negative feelings against black people in general.

205.

Nurse Annaleen Visser routinely treated the white inmates more favorably than the black inmates.

206.

Nurse Annaleen Visser knew that if she withheld medical care to Kevil Wingo in his condition that he would die.

207.

Nurse Annaleen Visser's conduct was done with reckless disregard of Mr. Wingo's rights.

208.

The acts and omissions of Defendant Annaleen Visser justify an award of punitive damages to Plaintiffs.

## **DAMAGES**

209.

Plaintiffs are entitled to recover as Administrator of Kevil Wingo's Estate and as Mr. Wingo's Children for both Survivorship and Wrongful Death Claims including but not limited to Mr. Wingo's pain and suffering, medical, funeral, and other expenses, the full value of Mr. Wingo's life, mental anguish, loss of society, companionship, care, and guidance that was proximately caused by all Defendants for its Section 1983 violations and Negligence.

## **JURY TRIAL DEMANDED**

210.

Plaintiffs demand a trial by a jury on all matters that can be so tried.

WHEREFORE, Plaintiff respectfully requests this Court enter Judgment against Defendants for actual and compensatory damages, award punitive damages against Nurse Annaleen Visser, attorney fees, costs, and all other relief the Court deems just and equitable.

## **CERTIFICATION**

Plaintiffs' counsel certifies that this brief has been prepared with 14 Point Font.

This 3<u>rd</u> day of September, 2020.

Respectfully submitted,

s/ Timothy J. Gardner
**TIMOTHY J. GARDNER**
Georgia Bar No. 115430
**HENRIETTA G. BROWN**
Georgia Bar No. 253547
**Attorneys for Plaintiffs**

Gardner Trial Attorneys, LLC
3100 Cumberland Blvd.
Suite 1470
Atlanta, GA 30339
Phone:  770.693.8202
Fax:  404.393.9838
tjg@gardnertrialattorneys.com
hgb@gardnertrialattorneys.com